959 P.2d 439

Leonard I. MEDNICK, Plaintiff–Appellee,

v.

Allen N. DAVEY, Defendant–Appellant.

No. 20435.

Intermediate Court of Appeals of Hawai'i.

May 29, 1998.

Allen N. Davey, pro se, and Enver W. Painter, Jr., Honolulu, on the briefs, for defendant-appellant.

Robert D. Kawamura, Honolulu, Stacy Moniz, and Kekuailohia M. Beamer (Kawamura, Lobdell & Moniz, of counsel), on the brief, for plaintiff-appellee.

Before BURNS, C.J., and WATANABE and KIRIMITSU, JJ.

WATANABE, Judge.

The dispositive issue in this appeal from a breach of contract action is whether the First Circuit Court (circuit court) properly granted partial summary judgment orders, determining, as a matter of law, that (1) a contract existed between Plaintiff–Appellee Leonard I. Mednick (Mednick) and Defendant–Appellant Allen N. Davey (Davey) for the sale and purchase of Mednick's business and the use of Mednick's logo, and (2) Davey breached said contract and was liable to Mednick for "the principal amount of $122,913.66 plus interest in the amount of $21,691.01 through February 7, 1995."

We answer the foregoing question in the negative and, accordingly, vacate the final judgment and the partial summary judgment orders challenged by this appeal.

## BACKGROUND

Mednick, a certified public accountant (CPA), owned a sole proprietorship CPA business in Hawai'i which operated under the registered trade name "IRS DeHassler." Mednick advertised that he could "dehassle" a person's tax woes with the Internal Revenue Service (IRS), and his practice focused primarily on taxpayer advocacy cases before the IRS. According to Mednick, part of the success of his business was due to a unique computer software program he had developed for his business using a WordPerfect macro, which enabled him to generate a power of attorney for a client, an engagement agreement, an internal checklist of things to watch out for in representing the client, and one or two letters to the IRS on behalf of the client.

Mednick testified during a deposition that in late 1990, he "start[ed] to get germs of ideas in the back of [his] mind" about expanding his business. He knew that to expand, he would need to free up his own time

operating the business and hire someone with strong administrative abilities to ultimately take over the office. In December 1990, after placing an advertisement for such a person, Mednick hired Davey, a CPA licensed in Michigan and Hawai'i and an attorney licensed to practice in Michigan and the federal courts, to be, in Mednick's words, the company's "key man."

In October or November of 1991, Mednick approached Davey about Mednick's desire to move to Texas, open a national chain of IRS DeHassler offices, and sell the Hawai'i IRS DeHassler practice to Davey. Davey testified during a deposition that he told Mednick that although he would be interested in entering into a license agreement to use Mednick's "IRS DeHassler" logo, he did not want to buy the business. Davey explained that he did not want to buy the business because

[t]here was an unknown liability for cases in the file. There was a tax practice where the largest client who had, say, 11 corporations, who probably generated more than half the income left and started his own business and prepared his own tax returns. The equipment was older equipment, and what I wanted was ·a license agreement just to use the name.

According to Davey, Mednick responded, "Make me a proposal." Therefore, Davey prepared a. "licensing agreement" and presented it to Mednick. However, Mednick refused to sign the agreement, saying, "You can't just license the name, you have to buy the practice." Davey responded that he wanted a license agreement and that any purchase of the business would have to be "interlocking" with a license agreement or there would be no deal.

On November 13, 1991, while negotiations between the parties were continuing, Mednick and Davey signed a typewritten document prepared by Davey entitled, "Intent to Enter into a License Agreement for IRS DeHassler" (Memorandum of Intent). The Memorandum of Intent stated, in relevant part, as follows:

This letter serves as a memorandum of our understanding that it is our intention that our negotiations will lead to a final License

Agreement, for the above IRS DeHassler trademark, and such agreement to be between ... Mednick ... and ... Davey, ... but that we do not intend the negotiations, including any oral promises or promises evinced by written memoranda, to constitute a binding contract. *We expressly reserve the right to be bound only by the signing of a written instrument, other than this letter, that is to be the final License Agreement between the parties.*

*Accordingly, any partial performance before the final License Agreement is signed is not accepted as evidence of a binding agreement between the parties.* The parties shall not consider that an agreement has been made on all the essential terms of the licensing agreement between the parties until such terms are incorporated into the final License Agreement and the final License Agreement is signed.

... [W]e consider the negotiations and the final transaction, its complexity and of such magnitude [sic] that *we are stipulating that a formal, executed writing is expected in the form of the final Agreement as the only binding agreement between the parties.*

(Emphases added.)

Davey testified that Mednick "was under the impression that a license agreement was not valid in Hawaii [Hawai'i]." Mednick was also concerned that the license agreement referred to in the Memorandum of Intent would be construed as an attempt to sell a franchise, which under Hawai'i law was subject to certain regulatory requirements which had not yet been complied with. Mednick therefore handwrote the following notation at the bottom of the Memorandum of Intent: " 'License' is not to be confused w/franchise if it is contrary to Hawaii [Hawai'i] law." Both Mednick and Davey initialed the notation.

Thereafter, the parties continued their negotiations. By a document dated November 19, 1991 and entitled, "Breakfast Notes," Mednick and Davey memorialized the sub-

stance of their ongoing discussions.[1] On December 5, 1991, the parties again met to discuss the proposed transaction. Typewritten notes memorializing the December 5, 1991 discussions were prepared and signed by Mednick and initialed by Davey (December 5, 1991 Notes). These notes, upon which Mednick based this breach of contract lawsuit, stated:

Re: Sale of CPA practice

Seller: Leonard Mednick Buyer: Allen Davey

This afternoon, during our negotiations for the sale of my CPA practice to you, we agreed to the following terms.

1) Sale of practice price: $150,000

2) Use of IRS DeHassler <tm> logo: $50,000 (waived)

3) Royalty: 10% of Gross Income (Exclusive of General Excise Taxes) payable monthly

4) Fixed assets and supplies: price to be determined under separate agreement.

5) Advertising: 3% of Gross Income (Exclusive of General Excise Taxes) payable monthly (To be waived until Seller begins a National/regional advertising program that will include State of Hawaii [Hawai'i].

6) Accounts Receivable to be assigned to Buyer with Seller to receive 50% of any receipts of such assigned receivables. (As of 10/31/91)

7) Buyer agrees that he will complete any cases now pending, at his expense, as consideration for the purchase 50% of the Accounts Receivable referred to in 6), above.

8) Buyer agrees that upon subsequent sale of practice, Seller will receive 1/3 of any capital gain. In the event that Buyer is enabled to sell sub-franchises in the state of Hawaii [Hawai'i], Seller will receive 1/3 of the sub-franchise selling price.

9) Effective date of transfer to be January 1, 1992.

---

1. The transcripts of the deposition of Defendant–Appellant Allen N. Davey (Davey) taken on June 1, 1993 indicate that Davey was questioned extensively about the November 19, 1991 "Break-

fast Notes," which had been marked as Deposition Exhibit B. However, a copy of the actual "Breakfast Notes" is not part of the record on appeal.

Davey testified that as set forth in the Memorandum of Intent, the December 5, 1991 Notes were never intended to constitute a final agreement of the parties. Davey points out that even after the December 5, 1991 Notes were typed up, negotiations continued between the parties as to the price for the assets of the company and other details of the transaction. Additionally, consistent with his understanding that the parties would be entering into a formal agreement, Davey prepared a *License Agreement* and an *Asset Purchase Agreement* and presented them to Mednick for approval. Mednick testified that he rejected both agreements because "[a]s far as he was concerned, these were documents that wouldn't be acceptable by the State of Hawaii [Hawai'i], and [he] didn't want to waste [his] time with them." Mednick explained that he did not believe the documents complied with Hawai'i's franchise laws and that because the two documents prepared by Davey were "not what I wanted, . . . we just kept on negotiating." Davey testified, however, that Mednick refused to sign the documents and instead told Davey to "[w]ait 'til the franchise agreement comes."

The depositions of Mednick and Davey reveal that shortly before Mednick was to leave Hawai'i for Texas in January 1992, he stopped by Davey's office to discuss the terms for Davey's payment of the $150,000 "sale of practice price" referred to in the December 5, 1991 Notes. These discussions were memorialized in a handwritten note signed by Davey which Mednick claims was a "promissory note." The substance of this note was as follows:

Office 30

— shell

<20,000>

$3,000 twice a month 1st and 16th

over 20K—75% to LIM to be pd on 1st of following month.

up to 50K down payment

10% payable on 15th of month

11% interest (or rounded up to next % of LIM's 2nd mortgage[) ]

Davey testified that "Office 30—shell" "probably pertains to Word Perfect and the software program" developed by Mednick, and the lined-out "20,000" reflects the fact that Mednick initially wanted $20,000 as a down payment against the $150,000 purchase price, an amount which Davey did not have. The $3,000 note, combined with the "up to 50K down payment" entry, "means [Mednick] was to get, he wanted 3,000—I offered to give him $3,000 twice a month until he received $50,000." The "over 20K—75% to LIM to be pd on 1st of following month" entry meant that "[i]f the business grossed 21,000, [Mednick] would get $750 of it, of the excess over 20,000." The line commencing with "10%" referred to the royalty payments referenced in the December 5, 1991 Notes, and the "11% interest" entry referred to the fact that interest on the unpaid balance would be calculated at 11% or the interest rate on Mednick's home equity loan, rounded up to the next whole number.

After Mednick left for Texas in January 1992, Davey made monthly payments to Mednick as follows:

| | |
|---|---:|
| January 1992 - two (2) $3,000 payments and one lump sum downpayment of $7,500 | $13,500 |
| February–July 1992 - $6,000 per month | 30,000 |
| August–November 1992 - $4,000 per month | 16,000 |
| December 1992 | 2,000 |
| Total | $67,500 |

On March 13, 1992, Mednick apparently transmitted to the Department of Commerce and Consumer Affairs (DCCA) a franchise-offering circular for IRS DeHassler of America Inc. Pursuant to the Franchise Investment Law codified in Hawai'i Revised Statutes (HRS) chapter 482E, the DCCA director is authorized to issue a *stop order* prohibiting the sale of a franchise[2] if the

**2.** Hawai'i Revised Statutes § 482E-2 (1993) defines "franchise" as

an oral or written contract or agreement, either expressed or implied, in which a person grants to another person, a license to use a trade name, service mark, trademark, logotype or related characteristic in which there is a community interest in the business of offering, selling, or distributing goods' or services at wholesale or retail, leasing, or otherwise, and in which the franchisee is required to pay, directly or indirectly, a franchise fee.

director finds, among other things, that "the order is in the public interest and that ... the offering circular is incomplete in any material respect or contains any statement which in the light of the circumstances under which it is or may be made false or misleading with respect to any material fact." HRS § 482E–8 (1993). The DCCA director apparently approved the circular on April 22, 1992.

Item I of the offering circular submitted by Mednick disclosed, in relevant part, that

IRS DeHassler® of America, Inc. (the "Franchisor"), is a Texas Corporation incorporated February 18, 1992 doing business under the name IRS DeHassler® ...

\* \* \*

*Franchisor is also in general partnership with IRS DeHassler® of Hawaii, whose other partner is Allen N. Davey, Esq* [sic] (who has no ownership or other operating interest in IRS DeHassler® of America, Inc.). IRS DeHassler® of Hawaii is not a franchise of IRS DeHassler® of America, Inc.

\* \* \*

... Prior to 1992, principal of Franchisor operated a CPA firm as a sole practitioner in Hawaii [Hawai'i] since 1967. Although the philosophy, concepts, and operating standards were developed during the course of this operation, the franchise operations are not exactly similar to the previous firms'. [sic] *That firm was reorganized and is now the partnership firm above-mentioned.*

(Emphases added.) Similarly, Item II of the offering circular indicated that "Mednick is also a partner of IRS DeHassler® of Hawaii [Hawai'i] (not a franchise) located in Honolulu, Hawaii [Hawai'i]."

After receiving the DCCA's approval, Mednick presented the franchise circular to Davey. Subsequently, in a letter dated May 31, 1992, Mednick wrote to Davey in part as follows:

As you know, *you and I have been operating as a partnership in Hawaii [Hawai'i]* since I sold you my practice. The financial terms of the *partnership* were somewhat similar to what the terms of the Franchise Agreement (FA) would be once I got it accepted by Hawaii [Hawai'i]. You and I had agreed that I would transfer back my interest in our *partnership* for the upcoming franchise. That is what is transpiring right now. I sent you the registered FA and Uniform Franchise Offering Circular (UFOC) for your signature. When you sign them, I will be happy to sign off on any *partnership interest* I may have if you will draw up that document. You are not now being asked to come up with any change in the $150,000 terms and royalty percentage in the new documents.

As you recall, because I considered you were a valued and trusted employee, and because you did not have sufficient resources to pay me $250,000 price for the sale of my practice package, nor even a significant down payment, *we agreed as follows:*

We would set up a partnership. I would transfer my firm's goodwill to the partnership. I would allow the partnership to use (but not keep) my IRS DeHassler® logo, temporarily, until I was able to meet Hawaii's [Hawai'i's] stringent rules for registering franchises. I would include the entire State of Hawaii [Hawai'i] in the subsequent FA. *I would accept your personal note for $150,000 with initial payments to me of far less that [sic] the $50,000 I sought.*

In return you promised:

To sign the registered FA and UFOC when they were ultimately accepted by Hawaii [Hawai'i]; to pay to me one third of any sub-franchise fees that you might earn, (in addition to my royalties), and one third of the ultimate sale, or other disposition of the Hawaii [Hawai'i] franchise. Several weeks later, after you had accepted this term, when you wanted to talk about it again, I offered you the original $250,000 deal (without the one-third share) and you again settled upon the deal as I am now outlining. (note that the "one-third" term is not in the FA that is in your hands, but will have appear[ed] as an addendum to it);

you would perform any and all work necessary to complete the work on clients that were still in work-in-progress.

(Emphases added.) Davey thereafter continued making monthly payments to Mednick until December 1992. However, when he and Mednick could not agree to the terms of a license or franchise agreement, he discontinued payments in December 1992.

## PROCEEDINGS BELOW

On February 13, 1993, Mednick filed the instant action, alleging in Count I of the complaint that the December 5, 1991 Notes constituted a contract between himself and Davey and that the contract had been breached by Davey. On July 6, 1994, Mednick filed a Motion for Partial Summary Judgment on Count I, the breach of contract claim, which motion was granted by the circuit court on September 16, 1994. In the September 16, 1994 order, the circuit court found "as a matter [of] fact and of law, [that] a contract existed between the parties for the sale and purchase of [Mednick's] CPA practice and use of [Mednick's] logo, in the amount of $150,000, as set forth in the parties' December 5, 1991 agreement." The circuit court also found "that all other issues are in dispute, including the terms of payment, the manner of payment, whether a breach of contract has occurred and whether [Mednick] is entitled to damages."

On December 23, 1994, Mednick filed a "Motion for Further Partial Summary Judgment on Count I (Breach of Contract) of the Complaint," alleging that as a matter of law, Davey was liable to Mednick for "failure to account for and to pay royalty payments for use of a trademarked logo" and for "failure to pay the balance of the purchase price of the CPA practice[.]" By an order entered on March 13, 1995, the circuit court granted said motion and found as follows:

1. [Davey] is required by the terms of the December 5, 1991 contract to account each month to [Mednick] for gross income and pay to [Mednick] royalty payments of 10% of such gross income (less gross excise tax paid) for the use of [Mednick's] trademarked logo;

2. [Davey] is required under the terms of the December 5, 1991 contract to pay to [Mednick] unpaid royalties in the principal amount of $32,255.32 through and including December 1994, plus legal (simple) interest at the rate of ten percent (10%) per annum: on the principal amount of $2,137.97 since December 31, 1992; on the principal amount of $12,893.17 since December 31, 1993; and, on the principal amount of $17,224.18 since December 31, 1994, as proved by [Mednick's] motion and exhibits; and

3. [Davey] is required under the terms of the December 5, 1991 contract to pay to [Mednick] the balance of the purchase price of the CPA practice, in the principal amount of $90,658.34, with legal (simple) interest at the rate of ten percent (10%) per annum since December 7, 1992 on that principal amount.

The circuit court ordered that Mednick be awarded a total of $122,913.66, plus interest in the amount of $21,691.01 through February 7, 1995. The court subsequently awarded Mednick attorney fees and costs and entered a final judgment, which was appealed. However, the appeal was dismissed by the Hawai'i Supreme Court for lack of appellate jurisdiction. After the case was remanded to the circuit court, Mednick filed a motion pursuant to Hawai'i Rules of Civil Procedure (HRCP) Rule 54(b), seeking a certification of the finality of all claims and issues involved in the case for appeal purposes. After the certification was granted, final judgment was entered on January 3, 1997. This appeal followed.

## DISCUSSION

### A.

Summary judgment is a drastic remedy which must be cautiously invoked in order to avoid improperly depriving a party to a lawsuit of the right to a trial on disputed factual issues. *GECC Fin. Corp. v. Jaffarian,* 79 Hawai'i 516, 521, 904 P.2d 530, 535 (App.), *aff'd,* 80 Hawai'i 118, 905 P.2d 624 (1995). Summary judgment should only be granted

if the pleadings, depositions, answers to interrogatories, and admissions on file, to-

gether with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. HRCP Rule 56(c) (1997).

■ The burden is on the moving party to show the absence of any genuine issue as to all material facts, which, under applicable principles of substantive law, entitles the moving party to a judgment as a matter of law. *Jaffarian*, 79 Hawai'i at 521, 904 P.2d at 535. This burden has two components.

■ First, the moving party has the burden of production. That is, the moving party must produce support for its claim that

> (1) no genuine issue of material fact exists with respect to the essential elements of the claim or defense which the motion seeks to establish or which the motion questions . . .; and (2) based on the undisputed facts, it is entitled to summary judgment as a matter of law.

*Id.*, 904 P.2d at 535 (citation omitted). It is only when the moving party satisfies its initial burden of production that the burden "shift[s] to the non-moving party to respond to the motion for summary judgment and demonstrate specific [material] facts, as opposed to general allegations, that present a genuine issue worthy of trial." *Id.* (citing C. Wright, A. Miller & M. Kane, 10A *Federal*

*Practice and Procedure: Civil 2d* § 2727, at 148 (1983)). "A fact is material if proof of that fact would have the effect of establishing or refuting one of the essential elements of a cause of action or defense asserted by the parties." *Hulsman v. Hemmeter Dev. Corp.*, 65 Haw. 58, 61, 647 P.2d 713, 716 (1982). In other words, a material fact is one upon which the outcome of the litigation depends.

■ Second, the moving party has the ultimate burden of persuasion. *Jaffarian*, 79 Hawai'i at 521, 904 P.2d at 535. That is, the moving party must convince the court that "no genuine issue of material fact exists and that the moving party is entitled to summary judgment as a matter of law." *Id.*

■ "The evidentiary standard required of a moving party in meeting its burden on a summary judgment motion depends on whether the moving party will have the burden of proof on the issue at trial." *Id.* Where the moving party is the plaintiff, who will ultimately bear the burden of proving plaintiff's claim at trial, the plaintiff must establish, by the quantum of evidence required by the applicable substantive law, each element of its claim for relief.[3] *Id.* That is, the plaintiff must establish as a matter of law each element of its claim for relief by the proper evidentiary standard applicable to that claim. *Beamer v. Nishiki*, 66 Haw. 572, 578, 670 P.2d 1264, 1270 (1983).[4]

3. In *GECC Fin. Corp. v. Jaffarian*, 79 Hawai'i 516, 521–22, 904 P.2d 530, 535–36 (App.1995), *aff'd*, 80 Hawai'i 118, 905 P.2d 624 (1995), the majority of this court held that where the party moving for summary judgment

> is the plaintiff, who will ultimately bear the burden of proving plaintiff's claim at trial, the plaintiff must: (1) establish, by the quantum of evidence required by the substantive law, each element of its claim for relief, . . . and (2) disprove every affirmative defense asserted against it.

In a concurring opinion, Judge Acoba disagreed that a plaintiff moving for summary judgment should be required "to 'disprove every affirmative defense asserted against it' as part of its initial burden." *Id.* at 525, 904 P.2d at 539. Judge Acoba stated that "[t]he plaintiff should be *obligated* to disprove an affirmative defense in moving for summary judgment when, but only when, the defense produces material in support of an affirmative defense. *Id.* at 526, 904 P.2d at 540 (emphasis in original). Subsequently, on certiorari, the Hawai'i Supreme Court agreed with the concurring opinion and held that a

plaintiff-movant is not required, as an initial burden, to disprove affirmative defenses asserted by a defendant in order to prevail on a motion for summary judgment." *GECC Fin. Corp. v. Jaffarian*, 80 Hawai'i 118, 119, 905 P.2d 624, 625 (1995).

4. In *Beamer v. Nishiki*, 66 Haw. 572, 578, 670 P.2d 1264, 1270 (1983), the trial court granted summary judgment in plaintiff's favor on plaintiff's damages claim for defamation. On appeal, the supreme court reversed, instructing:

> To prevail here on summary judgment, plaintiff must establish as a matter of law each element of defamation by a preponderance of the evidence except the element of actual malice which must be proven with a higher standard of "clear and convincing proof." The presence of an issue of fact from which a reasonable trier of fact could find plaintiff had not met her burden of proof on even one element of her defamation claim would be sufficient to defeat her motion of summary judgment.

## B.

■ An appellate court reviews an award of summary judgment under the same standard applied by the circuit court. *Kaiama v. AIG Hawaii Ins. Co.,* 84 Hawai'i 133, 134–35, 930 P.2d 1352, 1353–54 (1997). This involves a three-step analysis. *Jaffarian,* 79 Hawai'i at 522, 904 P.2d at 536, as affirmed and modified in 80 Hawai'i at 119, 905 P.2d at 625.

"First, we identify the issues framed by the pleadings since it is these allegations to which the motion must respond." *Jaffarian,* 79 Hawai'i at 522, 904 P.2d at 536.

"Secondly, we determine whether the moving party's showing has established [the material] facts which ... justify a judgment in movant's favor.[5] The motion must stand self-sufficient and cannot succeed because the opposition is weak." *Id.,* as affirmed and modified in 80 Hawai'i at 119, 905 P.2d at 625 (footnote added).

Where a plaintiff is the moving party, this involves examining whether the plaintiff has established prima facie, the material facts necessary to establish the essential elements of the claim or claims for which summary judgment in the plaintiff's favor is being sought. *Hunt v. Chang,* 60 Haw. 608, 618–19, 594 P.2d 118, 124 (1979).

When a plaintiff's summary judgment motion prima facie justifies a judgment on the plaintiff's claims, the third and final step is to determine (1) whether the opposition has demonstrated the existence of a triable, material factual issue on the plaintiff's claims, or (2) if the opposition has adduced evidence of material facts which demonstrate the existence of affirmative defenses that would de-

feat the plaintiff's claim, whether the plaintiff has demonstrated conclusively the non-existence of such facts. Counter-affidavits and declarations need not prove the opposition's case; they suffice if they disclose the existence of a triable issue. *Id.,* 79 Hawai'i at 522, 904 P.2d at 536, as modified in 80 Hawai'i at 119, 905 P.2d at 625.

We examine the partial summary judgment orders granted to Mednick under the foregoing analytical framework.

## C.

■ Count I of Mednick's complaint alleged as follows:

3. On or about December 5, 1991, in Honolulu, Hawaii [Hawai'i], Defendant entered into a contract with Plaintiff for the purchase of Plaintiff's certified public accountancy practice and use of Plaintiff's trademarked logo, IRS "Dehassler®". Defendant, *inter alia,* agreed to pay a price of $150,000 plus 10% interest per annum until paid in full, payable at the rate of $6,000 per month in two equal installments of $3,000 each on the first and sixteenth days of each month commencing January 1, 1992, plus a 10% royalty on the practice's gross proceeds.

4. Plaintiff has performed all the conditions of the contract on his part to be performed.

5. Defendant has failed and refused to pay past due monthly payments of $24,-000.00 and interest of $1,763.02, as due up to and including February 16, 1993 under the terms of the contract.

---

5. In *Jaffarian,* 79 Hawai'i at 522, 904 P.2d at 536, the majority opinion stated that appellate review of an award of summary judgment involves a three-step analysis, the second step of which involves determining

whether the moving party's showing has established facts which negate the opponent's claim and justify a judgment in movant's favor. The motion must stand self-sufficient and cannot succeed because the opposition is weak. A party cannot succeed without disproving even those claims on which the opponent would have the burden of proof at trial.

As noted in footnote 3, supra, however, the Hawai'i Supreme Court, on certiorari from our

decision in *Jaffarian,* agreed with Judge Acoba's concurring opinion that a plaintiff is not required to initially disprove a defendant's pleaded affirmative defenses in order to prevail on the motion for summary judgment but must disprove an affirmative defense "only when the defense produces material in support of an affirmative defense." Accordingly, a plaintiff who moves for summary judgment is not required to initially produce material facts which negate the opponent's claim, but is required to do so if the defendant comes forward with evidence establishing the defense.

6. Defendant has failed and refused to pay past due October, 1992 royalty payment of $813.19 as due on November 30, 1992, plus $17.37 interest, and royalty payments and interest as due for November, 1992, December, 1992 and January, 1993, and interest in amounts to be proven at trial.

In his answer to Mednick's complaint, Davey alleged numerous affirmative defenses relevant to Count I: statute of frauds, that no contract ever came into existence between the parties, failure of consideration, misrepresentation of material facts, nondisclosure of material facts, estoppel, good faith and honest intentions, and unclean hands.

In support of his first motion for partial summary judgment, Mednick submitted a copy of the December 5, 1991 Notes, transcripts of Mednick's and Davey's depositions, the alleged promissory note, copies of newspaper advertisements showing that Davey had used the IRS DeHassler® trademark, and copies of records indicating payments to Mednick by Davey. These documents were clearly sufficient to satisfy Mednick's initial burden of production.

However, Davey opposed Mednick's initial motion for partial summary judgment on the ground that a genuine issue of material fact existed as to whether a contract was ever entered into between the parties. Davey submitted affidavits, deposition transcripts, the Memorandum of Intent, and other documentary evidence to support his position that the December 5, 1991 Notes upon which this lawsuit was based was not intended to be a final contract between the parties and that the parties continued to negotiate the terms of the sale of Mednick's business and the use of Mednick's trademarked logo even after the December 5, 1991 Notes were typewritten.

Based on our *de novo* review, we agree that the pleadings, depositions, counter-affidavits, declarations, and other documents submitted by Davey demonstrated the existence of triable, material factual issues as to whether a contract existed between Mednick and Davey.

The Hawai'i Supreme Court has instructed that

[i]t is an elementary rule of contract law that there must be mutual assent or a meeting of the minds on all essential elements or terms in order to create a binding contract. And where a contract is complete and certain with respect to the essential and material terms and conditions of a lease, and no further negotiations as to other essential matters are contemplated, such a contract to enter into a lease will be enforced.

*Malani v. Clapp & Furuya,* 56 Haw. 507, 510, 542 P.2d 1265, 1267 (1975). The corollary to the foregoing rule is that where the parties contemplate further negotiations, no binding contract exists. As 17A Am.Jur.2d *Contracts* § 38 (1991) observes:

Whether the parties to an oral or informal agreement become bound prior to the drafting and execution of a contemplated formal writing is largely a question of intent, or, as is sometimes expressed, upon whether they intend the formal writing to be a condition precedent to the taking effect of the agreement. If the written draft is viewed by the parties merely as a convenient memorial or record of their previous contract, its absence does not affect the binding force of the contract; if, however, it is viewed as the consummation of the negotiation, there is no contract until the written draft is finally signed.

\* \* \*

Contracting parties may undoubtedly agree that they shall not become bound until the execution of a written or formal contract, and where it appears that such was the intention, effect will be given thereto; until the written or formal contract is executed, no valid and enforceable obligation will be held to arise, the courts thus in effect regarding the execution of the formal instrument as one of the essential terms of the agreement or as a prerequisite to the closing of the contract. This is especially true where the terms of a contract, or the conditions under which it is to become effective, are not fully and definitely settled in the preliminary negoti-

ations, and a written or more formal contract embodying the completed contract is contemplated.

In this case, the parties executed a Memorandum of Intent, by which they agreed not to be bound by any oral or written promises or any part performance of any oral or written promises until all essential terms of a licensing agreement were reached and a final License Agreement was signed by both parties. Furthermore, negotiations between the parties regarding the use of Mednick's trademark, which Davey testified was a crucial interlocking requirement for any purchase by him of Mednick's business, continued long after the signing of the December 5, 1991 Notes. Moreover, the parties never agreed on the terms of a license or franchise agreement. Finally, the franchise-offering circular which Mednick submitted to the DCCA, as well as the May 31, 1992 letter which Mednick sent to Davey, raise a question of fact as to whether the December 5, 1991 Notes was intended by the parties to constitute a contract for the sale to Davey of Mednick's business. In these documents, Mednick represents that Davey is Mednick's partner, rather than the owner of the Hawai'i business. When asked to explain the discrepancy between the December 5, 1991 Notes and the franchise documents, Mednick testified on deposition: "I misspoke. I thought we were going to have a partnership, but apparently we didn't.... We don't have a partnership. The [December 5, 1991] document prevails."

## CONCLUSION

In light of the record, we conclude that there exists a genuine issue of material fact as to whether the December 5, 1991 Notes constituted a contract between Mednick and Davey. Accordingly, we vacate the circuit court's (1) August 23, 1994 Order Granting in Part and Denying in Part Plaintiff's Motion for Partial Summary Judgment on Count I, (2) March 13, 1995 Order Granting Plaintiff's Motion for Further Partial Summary Judgment, and (3) January 7, 1997 Final Judgment as to All Claims and Parties, and remand for further proceedings consistent with this opinion.