53 P.3d 312

**OCWEN FEDERAL BANK, FSB, Plaintiff–Appellee,**

v.

**Alexa Nita RUSSELL, Defendant–Appellant,**

and

**Avondale Federal Savings Bank, et al., Defendants.**

No. 23653.

Intermediate Court of Appeals of Hawai'i.

July 31, 2002.

As Amended Oct. 18, 2002.

Alexa Nita Russell, on the briefs, defendant-appellant, pro se.

Walter Beh, II, Earl T. Sato, and Cheryl A. Nakamura (Rush Moore Craven Sutton Morry & Beh, a Limited Liability Law Partnership, LLP), on the briefs, Honolulu, for plaintiff-appellee.

WATANABE, Acting C.J., LIM, and FOLEY, JJ.

Opinion of the Court by WATANABE, Acting C.J.

*Pro se* Defendant–Appellant Alexa Nita Russell (Russell) appeals from the Judgment entered by the Circuit Court of the Third Circuit (the circuit court) on December 7, 1999 (December 7, 1999 Judgment), the Honorable Greg K. Nakamura (Judge Nakamura) presiding, pursuant to an order entered

that same day, granting summary judgment and an interlocutory decree of foreclosure in favor of substitute Plaintiff Ocwen Federal Bank, FSB (Ocwen).[1]

Because we conclude that issues of material fact existed that precluded the granting of summary judgment to Ocwen, we vacate the December 7, 1999 Judgment and remand this case to the circuit court for further proceedings consistent with this opinion.

## BACKGROUND

On December 9, 1996, Russell borrowed $224,750.00 from Quality Funding Inc. (Quality Funding) and executed a note by which she promised to repay said amount, plus interest at a yearly rate of 10.60 percent, in monthly installments of $2,072.70, the last payment being due on or before January 1, 2027. The loan was secured by a mortgage on property owned by Russell in Kapaʻau on the island of Hawaiʻi, on which Russell's residence was located (Property).

On February 17, 1998, Quality Funding filed a complaint in the circuit court against Russell, Avondale Federal Savings Bank,[2] and numerous John and Mary Does, Doe partnerships, Doe corporations, and other entities, alleging that Russell was in default on her note to Quality Funding and seeking to foreclose on Russell's mortgage. Russell was served with the complaint on March 12, 1998.

On April 3, 1998, Russell filed a petition in the United States Bankruptcy Court for the District of Hawaiʻi (the bankruptcy court), seeking relief under Chapter 7 of the United States Bankruptcy Code. As a result, the proceedings in the underlying foreclosure action were automatically stayed. On April 7, 1998, despite the stay, Russell filed an answer to Quality Funding's complaint in the foreclosure action, in which she admitted or denied the various allegations in Quality Funding's complaint and related that she had filed for Chapter 7 relief. On July 8, 1998, the bankruptcy court discharged Russell as a debtor. Accordingly, Ocwen concedes that Russell cannot be held liable for any deficiency judgment arising out of her debt.

On July 27, 1998, Russell filed in the circuit court an Objection and Answer to Complaint to Foreclose Mortgage as Amended. Russell disputed owing Quality Funding any money and raised numerous defenses, among them: confusion as to who the mortgagee was,[3] fraud, deception, manipulation, breach of fiduciary duty, violations of the federal Truth in Lending Act (TILA),[4] consumer

---

1. The Complaint to Foreclose Mortgage in this case was filed on February 17, 1998 by Plaintiff Quality Funding, Inc. Pursuant to an order filed on December 23, 1999, Ocwen Federal Bank, FSB (Ocwen) was substituted as Plaintiff.

2. The complaint alleged that Avondale Federal Savings Bank "may claim an interest in [Pro se Defendant–Appellant Alexa Nita Russell's (Russell)] Property by virtue of a Mortgage dated February 7, 1997, recorded in the Bureau of Conveyance[s] of the State of Hawaiʻi as Document No. 97–020001."

3. As exhibits to her Objection and Answer to Complaint to Foreclose Mortgage as Amended, Russell attached: (1) an Addendum to Good Faith Estimate, which named Quality Mortgage USA, Inc. as the lender of her loan; (2) the Lender's Closing Instructions for her loan, which indicated that Quality Funding Inc. was the lender; (3) a Notice of Assignment, Sale or Transfer of Servicing Rights, which informed her that the servicing of her loan, "that is, the right to collect payments from [her], is being assigned, sold or transferred from Quality Mortgage USA, Inc. to Advanta Mortgage Corp. USA"; and (4) a General Assignment and Bill of Sale, in which Quality

Mortgage USA, Inc. sold various assets to AMRESCO Residential Mortgage Corporation (AMRESCO).

4. In *Hawaii Community Fed. Credit Union v. Keka*, 94 Hawaiʻi 213, 223, 11 P.3d 1, 11 (2000), the Hawaiʻi Supreme Court, quoting from the United States Supreme Court's decision in *Beach v. Ocwen Fed. Bank*, 523 U.S. 410, 412–13, 118 S.Ct. 1408, 140 L.Ed.2d 566 (1998), explained that

[t]he declared purpose of [the federal Truth in Lending Act (TILA)] is "to assure a meaningful disclosure of credit terms so that the consumer will be able to compare more readily the various credit terms available to him [or her] and avoid the uninformed use of credit, and to protect the consumer against inaccurate and unfair credit billing and credit card practices." Accordingly, TILA requires creditors to provide borrowers with clear and accurate disclosures of terms dealing with things like finance charges, annual percentage rates of interest, and the borrower's rights. *See* [15 U.S.C.] §§ 1631, 1632, 1635, 1638. Failure to satisfy TILA subjects a lender to criminal penalties for noncompliance, *see* § 1611, as well as to statu-

protection violations, and unfair credit practices. Russell also sought monetary and compensatory damages of "$500,000 and the personal home and property which is the subject of this cause of action" for the injuries she suffered as a result of Quality Funding's lending practices. Russell explained that she

> held the subject loan one year prior to obtaining a new loan from the lender, paid on time and held good credit. The principal was approximately $205,000 and the lender charged the debtor the difference between $205,000 and $224,662.59 to fix the interest rate at a higher rate than [she] was paying. This means that there was a charge of of [sic] almost $20,000 to [her]. The implication of manipulation and deception by the original note and mortgage holder is very strong in this case.

On August 5, 1998, Quality Funding filed a "Notice of Bankruptcy Court's Order Granting [AMRESCO Residential Mortgage Corporation's (AMRESCO)] Motion for Relief from Automatic Stay" in the circuit court. The order provided, in pertinent part, that

> AMRESCO ..., its employees, attorneys, agents, and any foreclosure commissioner are authorized to exercise and enforce to [sic] all of its remedies against [Russell] and [Russell's] Property, including but not limited to, obtain judgment of foreclosure against [Russell] and the Property, recover possession over the Property, sell said Property and recover payment of its se-

cured claim from the sale of said [P]roperty. There shall be no deficiency judgment against [Russell] without further order of the Bankruptcy Court.

No explanation was provided as to how AMRESCO came to assume from Quality Funding the latter's position as creditor on Russell's note and mortgage.

On February 19, 1999, Quality Funding,[5] "in consideration of the sum of ONE DOLLAR ($1.00) and other valuable consideration[,]" assigned Russell's mortgage to Ocwen, with the assignment being recorded at the Hawai'i Bureau of Conveyances on April 26, 1999 (Assignment by Quality Funding). Ocwen thereafter filed a motion for summary judgment and interlocutory decree of foreclosure on September 21, 1999. In its motion, Ocwen alleged that "as the present owner of the mortgage note and mortgage[, it was] entitled to a foreclosure of its mortgage and to a sale of the [P]roperty in accordance with the terms of the mortgage." Attached to Ocwen's motion was a Declaration of Indebtedness by Gregory D. Whitworth (Whitworth), Ocwen's "authorized servicing agent[,]" declaring that he was "personally familiar with the payment history of [Russell]," and that Russell "has failed to pay the installments, principal and interest as required by [her] mortgage note and [f]irst [m]ortgage and is in default in respect thereof." Appended to Whitworth's declaration was a computerized printout, entitled "Automated Affidavit of Debt Screen," which re-

tory and actual damages traceable to a lender's failure to make the requisite disclosures, *see* § 1640. Section 1640(e) provides that an action for such damages "may be brought" within one year after a violation of TILA, but that a borrower may assert the right to damages "as a matter of defense by recoupment or set-off" in a collection action brought by the lender even after the one year is up.

Going beyond these rights to damages, TILA also authorizes a borrower whose loan is secured with his "principal dwelling," and who has been denied the requisite disclosures, to rescind the loan transaction entirely "until midnight of the third business day following the consummation of the transaction or the delivery of the information and rescission forms required under this section together with a statement containing the material disclosures required under this subchapter, whichever is later." § 1635(a). TILA provides,

however, that the borrower's right of rescission "shall expire three years after the date of consummation of the transaction or upon the sale of the property, whichever occurs first," even if the required disclosures have never been made. § 1635(f). TILA gives a borrower no express permission to assert the right of rescission as an affirmative defense after the expiration of the 3-year period.

(Citations, ellipsis, and internal brackets omitted.)

**5.** During Russell's bankruptcy proceedings, AMRESCO apparently produced a General Assignment and Bill of Sale and represented that it was the owner of Russell's note and mortgage pursuant to a General Assignment and Bill of Sale from Quality Mortgage USA, Inc. It is not clear from the record how Quality Funding came to assume the creditor position from AMRESCO on Russell's note.

flected that as of June 19, 1998, Russell owed the following amounts on the loan: a principal balance of $224,662.59; accrued interest of $33,009.12; late charges of $2,798.28; and escrow payments totaling $2,696.00 that had been advanced on Russell's behalf for "payment of taxes, insurance, property inspections, etc."

On September 24, 1999, Ocwen filed a Motion for Substitution of Real Party in Interest and for Amendment of Case Caption, pointing out that pursuant to an Assignment by Quality Funding, Ocwen was "technically the real party in interest" and should be substituted as the plaintiff in this case. Ocwen's motion was granted by an order filed on December 23, 1999.

On September 29, 1999, Russell filed an "Answer to and Notice of Objection to Motion of Summary Judgment on Grounds that the 'Plaintiff' of Record in this Action is [Quality Funding] **Not** [Ocwen]; Motion to Strike and Motion to Dismiss" (September 29, 1999 Objection to Ocwen's Motion for Summary Judgment) (bolding in original). Russell admitted owning the Property which Ocwen sought to foreclose but denied that she owed any money to Ocwen, who was **"not a Plaintiff or a real party of** [sic] **interest in this case[.]"** (Bolding in original.) Russell also sought to strike any documents filed by Ocwen "unless and until [Ocwen] has filed the proper court documents to become of record in this lawsuit and an appropriate order to that effect is made of record[.]" She also sought dismissal of Ocwen's summary judgment motion.

On October 1, 1999, Russell filed a Declaration, made "under penalty of perjury[,]" in support of her September 29, 1999 Objection to Ocwen's Motion for Summary Judgment. From Russell's Declaration, the exhibits attached thereto, and numerous other filings by Russell,[6] it appears that in 1995, Russell obtained a loan for $210,000 from Express Funding, Inc. That loan, which was secured by a mortgage on her Property and had an adjustable interest rate of 8.90 percent to 15.90 percent,[7] was subsequently transferred to Quality Funding, and a company by the name of Wendover Funding, Inc. took over as the servicing agent for the loan. Initially, Russell's monthly payment under that loan was for the amount of $1,674.62. In May of 1996, Russell was informed that beginning in June 1996, her interest rate would increase from 8.90 percent to 10.40 percent, resulting in a $1,903.51 monthly payment. In October 1996, Russell was informed that her interest rate would again increase, beginning in January 1997, from 10.40 percent to 11.125 percent, resulting in a $2,016.40 monthly payment. Since market interest rates were then dropping, Russell repeatedly called Quality Funding to inquire about obtaining a lower fixed-interest rate.

According to Russell, after a November 1996 phone call to Quality Funding's Irvine, California office, she was led to believe that she could refinance her loan, get a lower fixed-interest rate, and also get extra cash for Christmas and to make construction and architectural changes to accommodate a disabled minor child who lived in her home. She was also "assured there would be no problems and not to worry about making her November payment . . . as it would come out of the closing costs." However, when she went to sign the papers to close the loan, she discovered that the interest rate indicated on the loan documents was higher than what she was currently paying. Furthermore, although the principal amount for her new loan[8] was higher than the balance of the loan she was refinancing, she did not receive any

---

**6.** Throughout the proceedings below, Russell filed a plethora of documents responding to and opposing Ocwen's motion for summary judgment and interlocutory decree of foreclosure, raising questions about who owned her loan, and objecting to Ocwen's failure to respond to her numerous requests for discovery of information relative to her loan.

**7.** The loan documents in the record reflect that the interest rate could be adjusted every six months.

**8.** Russell's application for the refinancing loan, a copy of which was attached as an exhibit to Russell's declaration, indicated that the loan was for $232,500.00, with a 10.25 percent interest rate and payable over thirty years. Additionally, Russell's Property was acquired in 1986 at a cost of $180,000.00 and was encumbered by $205,000.00 in liens.

extra cash for Christmas or for home renovations. Russell claims that when she inquired about these discrepancies, she was told "that the interest would have to be higher and less financing money made available because of her 'poor' credit." However, Russell declared she had paid "all debts" reflected on the pre-qualifying credit report that had been ordered before her new loan was approved.

Russell also declared her strong and vehement belief that Quality Funding or a group of individuals associated with Quality Funding

> has a continuous cycle of unlawful predatory practices, consistent with violations of [TILA] and Federal Fair Trade Practices; as well as continued creditor harassment before, during and after her Bankruptcy; and, also committed numerous counts of fraud, interfered with pretrial discovery, inclusive of all interrogatories, admissions and denials, as well [as] schemed [sic] plan to perform a "bait" and "switch", and furthermore this "new" "Plaintiff" [Ocwen] was well aware of it.

In her declaration, Russell related that she had "still to date not received a full and complete copy of her file[,]" despite having requested it in a letter to Ocwen dated April 28, 1999.

On October 5, 1999, Russell filed an "Election to Rescind Pursuant to [TILA]; and Election to Counterclaim Pursuant to U[.]S[.] Supreme Court Case of Beach v[. Ocwen.]" Among the exhibits attached to this document was a letter, dated November 18, 1997, from an attorney for Russell to Ocwen's attorney, expressing Russell's desire "to resolve this matter without additional litigation" and setting forth Russell's position, in part, as follows:

> As I see it, we have two avenues to pursue. Under [TILA], as I told you, it is our position that a number of the charges were improperly included in the amount financed. In addition, [Russell] apparently did not get all of the required documents in a timely fashion.

On October 15, 1999, the circuit court heard Ocwen's motion for summary judgment and took the matter under advisement.

On November 12, 1999, Russell sent a letter, informing Ocwen: "[T]his Mortgage and Note has been rescinded in court via your attorneys Leu and Okuda through [the circuit court.]" On December 1, 1999, Ocwen's attorney filed a Notice of Submission, notifying Russell that he had submitted to the circuit court Ocwen's proposed "Findings of Fact; Conclusions of Law; Order Granting [Ocwen's] Motion for Summary Judgment Against [Russell], and All Other Defendants, and for Interlocutory Decree of Foreclosure" and Judgment, and informing Russell that she had five days from service of the notice to object to the proposed order.

Apparently believing that Ocwen's Notice of Submission telegraphed that the circuit court would sign off and file the document proposed by Ocwen, Russell filed, on December 3, 1999, a Motion for Reconsideration and a Motion for a New Trial. On December 7, 1999, the circuit court entered "Findings of Fact; Conclusions of Law; Order Granting [Ocwen's] Motion for Summary Judgment Against [Russell], and All Other Defendants, and for Interlocutory Decree of Foreclosure" (December 7, 1999 Order). The circuit court also entered its December 7, 1999 Judgment, directing that the December 7, 1999 Order be entered in favor of Ocwen and against all Defendants, pursuant to Hawai'i Rules of Civil Procedure (HRCP) Rule 54(b).

The Findings of Fact and Conclusions of Law set forth in the December 7, 1999 Order determined, in relevant part, that: (1) Russell was in default of a loan delivered to Quality Funding and secured by a first mortgage currently held by Ocwen; (2) as of June 19, 1999, Russell owed Ocwen $269,272.62, with interest continuing to accrue at a daily rate of $66.15 and late charges continuing to accrue at the monthly rate of $103.64; and (3) Ocwen was entitled to have its first mortgage on Russell's Property foreclosed on. The December 7, 1999 Order did not address any of Russell's defenses, nor Russell's rescission, due to TILA violations, of the loan being foreclosed on.

Russell filed a Notice of Appeal on January 13, 2000. Nevertheless, she continued to file in circuit court a bevy of motions, notices,

discovery requests, and other pleadings. On January 18, 2000, for example, she filed a Motion to Request Stay to Enforce Judgment Pending Appeal. On March 1, 2000, the circuit court resolved this motion by ordering as follows:

1. That the [December 7, 1999 Judgment] is stayed pending resolution of [Russell's] Motion For Reconsideration;

2. That [Ocwen] has thirty ("30") days from February 11, 2000 to provide supplemental memoranda and attached materials regarding the recision [sic] issue;

3. That [Russell] has 30 days after service of [Ocwen's] supplemental memoranda and attached materials regarding the recision [sic] issue to respond;

4. That if the 30 days falls on a Saturday or Sunday then the supplemental memoranda from [Ocwen] and the responsive memoranda from [Russell] is due on the following Monday[.]

However, Ocwen never provided the supplemental memoranda and materials regarding the rescission issue, as directed by the circuit court.

On February 9, 2000, Russell filed a Request for Entry of Default against Ocwen for failing to answer Russell's October 8, 1999 "Motion to Counterclaim Pursuant to U.S. Supreme Court Case of Beach v[. Ocwen.]" In response to this and other motions filed by Russell, Ocwen filed a memorandum in which it urged the circuit court to deny Russell's various requests for relief for several reasons, including the following:

1. Russell's Notice of Appeal deprived the circuit court of jurisdiction to grant Russell's motions;

2. Russell was in clear default of the subject mortgage since it was undisputed that she had not paid the amounts due and owing under the subject note and mortgage, and, therefore, Ocwen was entitled, as a matter of law, to a decree of foreclosure;

3. Ocwen was a holder in due course (HDC) and, therefore, not liable for the conduct of its assignors, even if Russell's claims were true; and

4. Russell's own exhibits demonstrate that Russell received the applicable disclosures required by TILA and, therefore, had no right to rescind the mortgage. Ocwen did not explain how Russell's exhibits demonstrated that Russell received the required TILA disclosures.

On March 9, 2000, Ocwen filed the following response to Russell's Request for Entry of Default on Russell's counterclaim:

The court granted [Ocwen's] Motion for Summary Judgment and for Interlocutory Decree of Foreclosure on November 3, 1999. [The December 7, 1999] Judgment was also entered . . . .

As a result, [Russell's] Counterclaim as a matter of law has been disposed [of] in [Ocwen's] favor.

[Ocwen] therefore denies all allegations in the Counterclaim which in any way creates liability against [Ocwen] or precludes or diminishes [Ocwen's] foreclosure rights with respect to the subject [P]roperty.

On June 1, 2000, Russell filed a motion to dismiss the foreclosure case against her. Russell maintained that Ocwen could not state a claim against her for which relief could be granted because:

1. The subject mortgage and note has been properly rescinded by [Russell]. In other words the subject transaction has been properly canceled and is no longer a valid mortgage or note by which to foreclose[.]

2. Records show that the Attorneys for [Ocwen] have thwarted all [of Russell's] discovery in this case. In other words [Ocwen] and it's [sic] attorneys have obstinately refused all [Russell's] requests for discovery.

3. The authenticity of the document by which [Ocwen] claims to "own" the subject mortgage and note is in doubt. In other words the original Plaintiff, [Quality Funding] did not own the rights to transfer ownership of the subject mortgage and note to the "new" Plaintiff as substituted, [Ocwen], at the time it claims to have transferred the mortgage and note to Ocwen.

. . . .

5. Ocwen was granted a motion to be substituted in this case ... as filed September 24, 1999. Thus, Ocwen claims to be an assignee of Quality [Funding].

6. Quality [Funding] could not have owned the mortgage and note at said time of transference or sale and yet represented to this Honorable Circuit Court that it was so. Quality [Funding] also represented ... that it had relief from the automatic stay as presented in it's [sic] order to same from the United States Bankruptcy Court, District of Hawaii [Hawai'i], as filed August 5, 1998. This representation can not [sic] be true as the document was in favor of a different party, [AMRESCO].

8. Quality [Funding] was not the party that received relief from the automatic stay ... [b]ut, Quality [Funding] filed a cause of action to foreclose a mortgage and note in the Circuit Court against [Russell] based on the results of that order and therefore are estopped to claim any differently.

9. THEREFORE, ... Quality Funding ... did not receive an order relieving it from the automatic stay as such.... Furthermore, Quality [Funding] was and still is subject to the automatic stay. So, is it's [sic] "substituted" party, [Ocwen]. It is a fact that the order lifting the automatic stay was in favor of [AMRESCO]....

....

12. ... if their [sic] pleadings before the United States Bankruptcy Court were true and correct, Quality Funding had no legal interest in the subject mortgage and note and could not legally transfer, sell[,] or assign any interest of said mortgage and note to Ocwen.

On June 1, 2000, the Hawai'i Supreme Court dismissed Russell's appeal on grounds that: (1) Russell's December 3, 1999 Motion for Reconsideration "tolled the time for appealing the December 7, 1999 [J]udgment until entry of an order disposing of the motion"; (2) "no order disposing of the motion for reconsideration has been entered"; and, therefore, (3) Russell's "notice of appeal, filed during the pendency of the motion for reconsideration, is of no effect[.]"

On June 20, 2000, Ocwen filed a Memorandum in Opposition to Russell's Motion to Dismiss, arguing, in summary, as follows:

(1) Russell's Motion to Dismiss is untimely and presents arguments that have been previously considered and rejected by the circuit court;

(2) Russell did not rescind the loan transaction within three days of the consummation of the transaction; has not presented any evidence that the information or forms required by TILA were not provided to her, thereby, extending the rescission period beyond the three-day period; and has failed to show that she was entitled to rescind the transaction or that foreclosure of the mortgage was improper;

(3) If Russell is entitled to rescind the transaction, she would be required to refund to Ocwen the money lent to her "for a debt that has been discharged in bankruptcy and for which she is no longer [personally] liable";

(4) Ocwen has not prevented Russell from conducting discovery that is relevant to any outstanding issues; and since summary judgment has already been granted, discovery is not permitted;

(5) Ocwen clearly owns the note and mortgage according to records of the Hawai'i Bureau of Conveyances; and

(6) The bankruptcy case closed on July 9, 1999 and, therefore, the automatic stay was no longer in effect.

On July 19, 2000, Ocwen's attorney filed in the circuit court a Notice of Submission addressed to Russell and Avondale, notifying them that an attached "ORDER DENYING [RUSSELL'S] MOTION TO DISMISS FILED ON JUNE 1, 2000" had been submitted to the circuit court and that they had five days from service of the notice to deliver to the circuit court a statement of objections to the proposed order. The proposed order denied Russell's Motion to Dismiss, gave Russell until the next day, July 20, 2000, to submit a supplemental memorandum regarding the TILA rescission issue, and provided Ocwen fourteen days after service of Russell's supplemental memorandum to submit a reply memorandum. Russell's objection to

the proposed order had previously been filed on July 11, 2000, apparently after Russell had received a copy of the proposed order from Ocwen's attorney.

On July 20, 2000, Russell filed a "Reply Memorandum to [Ocwen's] Motion in Opposition to [Russell's] Motion for Reconsideration and Memorandum of Law in Support of [Russell's] Motion to Reconsider." In the memorandum, Russell reiterated the factual history of the underlying loan and argued that her Motion for Reconsideration should be granted and that genuine issues of material fact existed as to:

(1) Whether "[t]he subject mortgage and note were in fact rescinded[,]" thus canceling and defeating her underlying obligation and providing an "absolute defense to foreclosure";

(2) Whether Ocwen was an HDC;

(3) Whether the "entire 'transaction' was a form of a 'shell['] game, and a 'hat trick' accounting maneuver or fraud in the inception[,]" which Russell expected "a true, full, and original complete copy" of her loan file that she had specifically requested from Ocwen and which Ocwen had not yet produced;

(4) The merits of her "outstanding unanswered Counterclaim in this case as filed simultaneously and amended";

(5) Whether she is entitled to damages; and

(6) Whether illegalities occurred when Russell "was 'flipped' from a 'lower' interest rate to a higher interest rate, and zero funds were given to her, but she was charged approximately $15,000 in fees, etc...."

On July 24, 2000, Russell filed an Amendment to Counterclaim and Memorandum of Law, claiming that at a June 30, 2000 hearing on her motion to dismiss, Judge Nakamura had indicated that he would accept an amended counterclaim from her, as well as a response from Ocwen to her motion for reconsideration. On the same day, Russell filed a Post Hearing Memorandum, responding to Judge Nakamura's oral ruling at the June 30, 2000 hearing, denying, as untimely, Russell's motion to dismiss. Russell stated

in her memorandum that her motion to dismiss "in essence, goes to a question of jurisdiction. If a party has no claim, then there is no jurisdiction, and jurisdiction can be raised at any time, even as late as on appeal."

On July 31, 2000, Ocwen filed its Reply Memorandum to Russell's July 20, 2000 and July 24, 2000 memoranda. Ocwen urged the circuit court to deny Russell's Motion for Reconsideration because:

> The record in this case clearly shows that [Ocwen] is the holder of the note and mortgage, both in fact and according to the records of the Bureau of Conveyances of the State of Hawaii [Hawai'i]. [Russell] has not presented any evidence to the contrary....
>
> [Russell] also has failed to present any evidence that any required [TILA] disclosures or forms were not provided to her, thereby extended the rescission period from three days to three years. Even if the rescission period is three years ... the [c]ourt has the power under Regulation Z to alter the procedure for [Russell] to return the money lent to her and for [Ocwen] to terminate its security interest. [Russell's] assertion that she received no money in the loan transaction overlooks that this was a refinancing of a previous loan where the loan proceeds were used to pay off the prior loan.
>
> All of the arguments made by [Russell] in her memoranda are repetitive of what she has presented to the [c]ourt in the past and she has not presented any new evidence.

(Citations omitted.)

On August 7, 2000, the circuit court entered a written order denying Russell's motion to dismiss but allowing Russell "until July 20, 2000 to submit a supplemental memorandum regarding the [TILA] rescission issue as it relates to her motion for reconsideration."

On August 11, 2000, Russell filed a premature notice of appeal from the circuit court's December 7, 1999 Order, and on August 21, 2000, the circuit court entered an order denying Russell's motion for reconsideration and

motion for a new trial. Although Russell's August 11, 2000 notice of appeal was premature, it is treated as timely filed on August 21, 2000, pursuant to Hawai'i Rules of Appellate Procedure Rule 4(a)(2).[9]

## STANDARD OF REVIEW

### A.

Summary judgment is a drastic remedy which must be cautiously invoked in order "[t]o avoid improperly depriving a party to a lawsuit of the right to a trial on disputed factual issues[.]" *GECC Fin. Corp. v. Jaffarian*, 79 Hawai'i 516, 521, 904 P.2d 530, 535 (App.), *aff'd and modified*, 80 Hawai'i 118, 905 P.2d 624 (1995). Summary judgment is appropriate only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." HRCP Rule 56(c) (1990).

> A fact is material if proof of that fact would have the effect of establishing or refuting one of the essential elements of a cause of action or defense asserted by the parties. The evidence must be viewed in the light most favorable to the non-moving party. In other words, we must view all of the evidence and the inferences drawn therefrom in the light most favorable to the party opposing the motion.

*Hawaii Community Fed. Credit Union v. Keka*, 94 Hawai'i 213, 221, 11 P.3d 1, 9 (2000) (hereinafter, *Keka* ) (brackets, citations, internal margins, and quotation marks omitted).

> The burden is on the party moving for summary judgment (moving party) to show the absence of any genuine issue as to all material facts, which, under applicable principles of substantive law, entitles the moving party to judgment as a matter of law. This burden has two components.

First, the moving party has the burden of producing support for its claim that: (1) no genuine issue of material fact exists with respect to the essential elements of the claim or defense which the motion seeks to establish or which the motion questions; and (2) based on the undisputed facts, it is entitled to summary judgment as a matter of law. Only when the moving party satisfies its initial burden of production does the burden shift to the non-moving party to respond to the motion for summary judgment and demonstrate specific facts, as opposed to general allegations, that present a genuine issue worthy of trial.

Second, the moving party bears the ultimate burden of persuasion. This burden always remains with the moving party and requires the moving party to convince the court that no genuine issue of material fact exists and that the moving party is entitled to summary judgment as a matter of law.

The moving party's burden of proof is a stringent one, since the inferences to be drawn from the underlying facts alleged in the relevant materials considered by the court in deciding the motion must be viewed in the light most favorable to the non-moving party, and any doubt concerning the propriety of granting the motion should be resolved in favor of the non-moving party.

The evidentiary standard required of a moving party in meeting its burden on a summary judgment motion depends on whether the moving party will have the burden of proof on the issue at trial.

*GECC Fin. Corp. v. Jaffarian*, 79 Hawai'i at 521, 904 P.2d at 535 (citations omitted).

■ "Where the moving party is the plaintiff, who will ultimately bear the burden of proving [the] plaintiff's claim at trial, the plaintiff" has the initial burden of establishing, by the quantum of evidence required by the applicable substantive law, each element of its claim for relief. *Id.* That is, the plain-

---

**9.** Effective January 1, 2000, Hawai'i Rules of Appellate Procedure Rule 4(a)(2) provided as follows:

   **(a) Appeals in Civil Cases.**

   . . . .

(2) *Premature Filing of Appeal.* In any case in which a notice of appeal has been filed prematurely, such notice shall be considered as filed immediately after the time the judgment becomes final for the purpose of appeal.

tiff must establish, as a matter of law, each element of its claim for relief by the proper evidentiary standard applicable to that claim. *Beamer v. Nishiki*, 66 Haw. 572, 578, 670 P.2d 1264, 1270 (1983).[10]

[2, 3] Where a plaintiff-moving party has satisfied its obligation of showing, *prima facie*, that there is no genuine issue of material fact and the plaintiff is entitled to a judgment as a matter of law, the burden shifts to the defendant-non-moving party to produce materials regarding any affirmative defenses that have been raised *pro forma* in the pleadings. *GECC Fin. Corp. v. Jaffarian*, 79 Hawai'i at 526, 904 P.2d at 540 (Acoba, J., concurring), concurring opinion adopted by the Hawai'i Supreme Court in *GECC Fin. Corp. v. Jaffarian*, 80 Hawai'i 118, 119, 905 P.2d 624, 625 (1995). If the defense produces material in support of an affirmative defense, the plaintiff is then *"obligated* to disprove an affirmative defense in moving for summary judgment[.]" *Jaffarian*, 79 Hawai'i at 526, 904 P.2d at 540 (emphasis in original).

### B.

■ An appellate court reviews a grant or denial of a summary judgment motion under the *de novo* standard. *Keka*, 94 Hawai'i at 221, 11 P.3d at 9. We apply a three-step analysis in such a review. *Mednick v. Davey*, 87 Hawai'i 450, 457, 959 P.2d 439, 446 (App.1998).

First, we identify the issues framed by the pleadings since it is these allegations to which the motion must respond.

Secondly, we determine whether the moving party's showing has established the material facts which justify a judgment in movant's favor. The motion must stand self-sufficient and cannot succeed because the opposition is weak.

Where a plaintiff is the moving party, this involves examining whether the plaintiff has established prima facie, the material facts necessary to establish the essential elements of the claim or claims for which summary judgment in the plaintiff's favor is being sought.

When a plaintiff's summary judgment motion prima facie justifies a judgment on the plaintiff's claims, the third and final step is to determine (1) whether the opposition has demonstrated the existence of a triable, material factual issue on the plaintiff's claims, or (2) if the opposition has adduced evidence of material facts which demonstrate the existence of affirmative defenses that would defeat the plaintiff's claim, whether the plaintiff has demonstrated conclusively the non-existence of such facts. Counter-affidavits and declarations need not prove the opposition's case; they suffice if they disclose the existence of a triable issue.

*Id.* (brackets, citations, footnote, and quotation marks omitted).

We examine the order granting summary judgment and interlocutory decree of foreclosure to Ocwen under the foregoing analytical framework.

### DISCUSSION

A.  *The Issues Framed by the Pleadings*

Quality Funding's complaint in this case was fairly straightforward. Quality Funding alleged that Russell had defaulted on her note, which was secured by a mortgage on Russell's Property, and Quality Funding was thus entitled to foreclose on the Property.

In her answer and subsequent pleadings, Russell denied owing Quality Funding any money and raised the defenses of fraud, deception, manipulation, breach of fiduciary

---

**10.** In *Beamer v. Nishiki*, 66 Haw. 572, 578, 670 P.2d 1264, 1270 (1983), the supreme court reversed a summary judgment granted by the trial court in the plaintiff's favor on plaintiff's claim for damages for defamation. The supreme court stated:

To prevail here on summary judgment, plaintiff must establish as a matter of law each element of defamation by a preponderance of the evidence except the element of actual mal-

ice, which must be proven with a higher standard of "clear and convincing proof." The presence of an issue of fact from which a reasonable trier of fact could find plaintiff had not met her burden of proof on even one element of her defamation claim would be sufficient to defeat her motion for summary judgment.

(Citation omitted.)

duty, TILA violations, consumer protection violations, and unfair credit practices. Russell also raised questions regarding the identity of the mortgagee on her mortgage.

### B. *The Facts Established by Ocwen in Its Summary Judgment Motion*

In moving for summary judgment and interlocutory decree of foreclosure, Ocwen submitted the following documentation:

(1) A copy of the mortgage note signed by Russell;

(2) A copy of the mortgage signed by Russell;

(3) A Declaration of Indebtedness, signed by Whitworth, the "authorized servicing agent for [Ocwen]," who declared that: he was "personally familiar with the payment history of [Russell,]" Russell "has failed to pay the installments, principal and interest as required by [her] mortgage note and [f]irst [m]ortgage[,]" proper demands for payment of all delinquent amounts due and owing to Ocwen were made against Russell, and the records showing the amounts were set forth in an attached exhibit to Whitworth's declaration;

(4) An Automated Affidavit of Debt Screen attached to Whitworth's affidavit, which indicates that from March 1, 1997 through June 19, 1998, Russell was twenty-eight payments delinquent and owed Ocwen $33,009.12 in accrued interest, $2,798.28 in late charges, and $2,696.00 for an escrow advance by a prior servicer of Russell's loan for payment of taxes, insurance, property inspections, etc.; and

(5) A copy of an Assignment of Real Property Mortgage and Financing Statement, purportedly recorded at the Hawaiʻi Bureau of Conveyances on April 26, 1999, indicating that Quality Funding had assigned Russell's mortgage to Ocwen, "together with the promissory note and the debts thereby secured, . . . together also with all the right, title and interest . . . in and to the property described in the Exhibit '___' attached to said mortgage[.]"

The foregoing documents were clearly sufficient to satisfy Ocwen's initial burden of producing the documentation necessary to establish that Russell had defaulted on her note and that Ocwen was entitled to foreclose on the mortgage securing Russell's note.

We turn, then, to an analysis of whether Russell produced the necessary material in support of her affirmative defenses to counter Ocwen's *prima facie* case and thereby obligate Ocwen to disprove Russell's affirmative defenses.

### C. *The Facts Established by Russell in Support of Her Affirmative Defenses*

The facts adduced by Russell in this case are strikingly similar to those established by the defendants in *Keka*, 94 Hawaiʻi 213, 11 P.3d 1. In that case, the Kekas, who were defendants in a mortgage foreclosure action brought by the Hawaii Community Federal Credit Union (Credit Union), asserted counterclaims based on fraud, violations of TILA, and violations of the state unfair and deceptive trade practices law, Hawaii Revised Statutes (HRS) chapter 480. In affidavits attached to their counterclaim, the Kekas asserted that: (1) they did not receive copies of the Notice of the Right to Cancel and the Disclosure Statement, required by TILA until April 1998; (2) they were first informed by a Credit Union "loan officer that the interest rate on their loan would be nine percent, instead of seven and one-fourth percent, on June 7, 1994, the day loan documents were signed, which caught them unprepared"; and (3) "the Credit Union was mistaken as to the amount owed by the Kekas." *Id.* at 218, 11 P.3d at 6 (brackets and internal quotation marks omitted).

The Credit Union subsequently filed a motion for summary judgment with respect to its complaint for foreclosure and the Kekas' counterclaim. In support of its motion, the Credit Union attached the affidavit of a Credit Union officer, who asserted that he was " 'personally familiar with the payment history of the Kekas,' that the Kekas were 'in default' " of their note and mortgage, and that as of December 30, 1998, the Kekas owed an unpaid principal balance of $59,802.47, accrued interest of $4,417.81, and accrued late charges of $263.16, for a total

unpaid balance of $64,483.44. *Id.* (brackets omitted). To disprove the Kekas' counterclaim, the Credit Union submitted " 'true' copies of the 'Right to Cancel' and 'Truth in Lending Disclosure Statement' forms," purportedly signed by the Kekas on June 7, 1994. *Id.*

In a memorandum in opposition to the Credit Union's motion for summary judgment, the Kekas argued, among other things, that: (1) they "had a right to rescind their loan and mortgage" because the Credit Union had committed TILA violations and common law fraud in the inducement, and (2) the Credit Union officer's affidavit "contained inadmissible hearsay that (a) did not generate a rebuttable presumption of the delivery of the [TILA] 'disclosures' required by 15 U.S.C. § 1635(c), and (b) violated the requirements of HRCP Rule 56(e) (2000)[.]" *Id.* (footnote omitted). Attached to the Kekas' memorandum was a declaration by Arthur Keka in which he

averred, *inter alia,* (1) that the Credit Union (a) had failed to deliver the notice of right to cancel and disclosure statements required by TILA, (b) "induced" the Kekas to sign copies of the notice of right to cancel and disclosure statement when the loan documents were signed on June 7, 1994, (c) "induced" the Kekas to sign the loan documents providing for a nine percent interest rate, purportedly an "in house" rate, instead of the rate of seven and one-fourth percent, as previously agreed, (2) that the Credit Union's loan officer had represented that it would be "no problem" to change the interest rate applicable to their loan when the "in house" rate decreased, but that the same loan officer had refused the Kekas' request to change the rate a year later, stating that it would be "too much trouble," and (3) that the Kekas had no finance and business experience and had relied on the Credit Union's loan officer's advice.

*Keka,* 94 Hawai'i at 219, 11 P.3d at 7.

The Credit Union did not respond to the Kekas' memorandum. Following a hearing on the summary judgment motion and the submission of supplemental memoranda by the parties, the circuit court entered an order granting the Credit Union's motion for summary judgment. On appeal, the supreme court agreed with the Kekas that summary judgment had been improperly granted. *Id.* at 221, 11 P.3d at 9. The supreme court held that the Kekas had raised genuine issues of material facts as to merits of their TILA, fraud, and unfair and deceptive trade practices defenses, thus precluding the award of summary judgment in favor of the Credit Union. *Id.* at 223–30, 11 P.3d at 11–18. Specific to the TILA defense, the supreme court held that the affidavit by the Kekas that they had not received from the Credit Union timely notice of their right to cancel and other disclosure statements, as required by TILA, was "sufficient to create a genuine issue of material fact as to whether the statutory presumption [of delivery of such statements] had been rebutted, thereby precluding summary judgment[.]" *Id.* at 224, 11 P.3d at 12.

■ Our review of the record in this case reveals that Russell similarly adduced substantial evidence to support her counterclaim and many of her affirmative defenses to Ocwen's foreclosure complaint, clearly sufficient to raise genuine issues of material fact as to the merits of Russell's defenses. Russell's many pleadings and declarations under penalty of perjury raised issues of material fact as to the validity of the note and mortgage that Russell had entered into in favor of Quality Funding; whether Ocwen had the right to sue upon the note and mortgage; and whether Quality Funding, in compliance with TILA, had properly disclosed to Russell the terms of her refinancing loan and the finance charges and interest she was being assessed.

We have been unable to discern any evidence adduced by Russell to support her apparent defense that she did not receive the required TILA disclosures regarding her refinancing loan, thereby allowing her three years to rescind the loan transaction. Unlike in *Keka,* Ocwen did not submit a copy of any signed acknowledgment by Russell that she had received the required TILA disclosures. However, the record reveals that Ocwen ignored Russell's many requests for the docu-

ments regarding her loan transaction. Additionally, HRCP Rule 56(f) provides:

> Should it appear from the affidavits of a party opposing the motion [for summary judgment] that the party cannot for reasons stated present by affidavit facts essential to justify the party's opposition, the court may refuse the application for judgment or may order a continuance to permit affidavits to be obtained or depositions to be taken or discovery to be had or may make such other order as is just.

Accordingly, we cannot fault Russell for her inability to support this TILA defense.

### D. *Ocwen's HDC Argument*

#### 1.

Pursuant to HRS § 490:3–305 (1993),[11] which is part of Article 3 of Hawai'i's Uniform Commercial Code, an HDC of a negotiable instrument takes the instrument free from certain defenses that may be raised by the instrument's obligor.

During proceedings before the circuit court,[12] Ocwen argued that because it was an HDC of the note originally held by Quality Funding, it was entitled to foreclose on the note, free and clear of any TILA or other defenses asserted by Russell. That is, Ocwen argued that even if Russell's defenses were true, Ocwen could not be held liable for any wrongdoing by its assignor.

An HDC is defined in HRS § 490:3–302(a) (1993) as

> the holder of an instrument if:
>
> (1) The instrument when issued or negotiated to the holder does not bear such apparent evidence of forgery or alteration or is not otherwise so irregular or incomplete as to call into question its authenticity; and
>
> (2) The holder took the instrument (i) for value, (ii) in good faith, (iii) without notice that the instrument is overdue or has been dishonored or that there is an uncured default with respect to payment of another instrument issued as part of the same series, (iv) without notice that the instrument contains an unauthorized signature or has been altered, (v) without notice of any claim to the instrument described in section

11. Hawaii Revised Statutes § 490:3–305 (1993) provides, in relevant part, as follows:

> **Defenses and claims in recoupment.** (a) Except as stated in subsection (b), the right to enforce the obligation of a party to pay the instrument is subject to the following:
>
> (1) A defense of the obligor based on (i) infancy of the obligor to the extent it is a defense to a simple contract, (ii) duress, lack of legal capacity, or illegality of the transaction which, under other law, nullifies the obligation of the obligor, (iii) fraud that induced the obligor to sign the instrument with neither knowledge nor reasonable opportunity to learn of its character or its essential terms, or (iv) discharge of the obligor in insolvency proceedings;
>
> (2) A defense of the obligor stated in another section of this Article or a defense of the obligor that would be available if the person entitled to enforce the instrument were enforcing a right to payment under a simple contract; and
>
> (3) A claim in recoupment of the obligor against the original payee of the instrument if the claim arose from the transaction that gave rise to the instrument; but the claim of the obligor may be asserted against a transferee of the instrument only to reduce the amount owing on the instrument at the time the action is brought.
>
> (b) The right of a holder in due course [(HDC)] to enforce the obligation of a party to pay the instrument is subject to defenses of the obligor stated in subsection (a)(1), but is not subject to defenses of the obligor stated in subsection (a)(2) or claims in recoupment stated in subsection (a)(3) against a person other than the holder.
>
> (c) Except as stated in subsection (d), in an action to enforce the obligation of a party to pay the instrument, the obligor may not assert against the person entitled to enforce the instrument a defense, claim in recoupment, or claim to the instrument (section 490:3–306) of another person, but the other person's claim to the instrument may be asserted by the obligor if the other person is joined in the action and personally asserts the claim against the person entitled to enforce the instrument. An obligor is not obliged to pay the instrument if the person seeking enforcement of the instrument does not have rights of [an HDC] and the obligor proves that the instrument is a lost or stolen instrument.

12. On appeal, Ocwen claims that "[i]t is immaterial whether [it] is [an HDC] ... because it was undisputed that Russell is in default under the Mortgage and Note."

490:3–306, and (vi) without notice that any party has a defense or claim in recoupment described in section 490:3–305(a).

Under HRS § 490:3–303(a) (1993),

[a]n instrument is issued or transferred for value if:

(1) The instrument is issued or transferred for a promise of performance, to the extent the promise has been performed;

(2) The transferee acquires a security interest or other lien in the instrument other than a lien obtained by judicial proceeding;

(3) The instrument is issued or transferred as payment of, or as security for, an antecedent claim against any person, whether or not the claim is due;

(4) The instrument is issued or transferred in exchange for a negotiable instrument; or

(5) The instrument is issued or transferred in exchange for the incurring of an irrevocable obligation to a third party by the person taking the instrument.

Further, HRS § 490:3–303(b) (1993) defines "consideration" as

any consideration sufficient to support a simple contract. The drawer or maker of an instrument has a defense if the instrument is issued without consideration. If an instrument is issued for a promise of performance, the issuer has a defense to the extent performance of the promise is due and the promise has not been performed. If an instrument is issued for value as stated in subsection (a), the instrument is also issued for consideration.

■ Our review of the record reveals that genuine issues of material fact exist as to whether Ocwen was an HDC. First, the only evidence in the record as to whether Ocwen took Russell's note "for value" is a copy of the recorded assignment of Russell's promissory note from Quality Funding to Ocwen that indicates on its face that the consideration for the assignment was "the sum of ONE DOLLAR ($1.00) and other valuable

consideration[.]" Given that Russell's note was assigned to Ocwen after Russell had raised her defenses in the bankruptcy court and filed her answer raising her defenses in the court below, serious questions exist as to whether Ocwen took the note "in good faith" and "without notice that the [note was] overdue" or that Russell had "a defense or claim in recoupment[.]" Ocwen's status as an HDC, therefore, depends on the establishment of facts at trial, a situation clearly not appropriate for resolution by summary judgment.

Other courts have held, on similar records, that whether an assignee of a note is an HDC is a question of fact sufficient to preclude the granting of a motion for summary judgment. *See First City Nat'l Bank & Trust Co. v. Zellner*, 782 F.Supp. 232 (S.D.N.Y.1992); *American Inv. Bank, N.A. v. Dobbin*, 209 A.D.2d 780, 617 N.Y.S.2d 999 (1994).

### 2.

Finally, we note that even if Ocwen were ultimately shown to be an HDC of Russell's promissory note, Ocwen may still be subject to Russell's TILA rescission claims. In *Stone v. Mehlberg*, 728 F.Supp. 1341 (W.D. Mich.1989 & Supp. Op.1990), a case referred to by the Hawai'i Supreme Court in *Keka*, 94 Hawai'i at 224, 11 P.3d at 12, a federal district court in Michigan held that the assignees of a negotiable promissory note could not rely on the HDC doctrine to avoid the application of a TILA rescission by the obligor on the note. Concluding that the TILA rescission remedy preempts the HDC doctrine, the court stated:

15 U.S.C. § 1635(a) states that obligors not informed of their rights are entitled to rescind "the transaction." The statute does not say that obligors may rescind only that part of the transaction that creates a security interest, but not the underlying obligation evidenced by a negotiable note. In fact, 15 U.S.C. § 1635(b) clearly contemplates a return to the status quo ante and thus the extinguishment of the underlying obligation. The HDC doctrine is inconsistent with this remedial purpose. Cases holding that a TILA breach does not

discharge liability on a note, such as *Federal Deposit Ins. Co. v. Webb,* 464 F.Supp. 520, 525 (E.D.Tenn.1978) do not discuss rescission, which is specifically excepted from the general rule that TILA does not affect such obligations. *See* 15 U.S.C. § 1610(d).

Moreover, to allow assignee HDC's to assert their status to foil an otherwise meritorious rescission action would gut 15 U.S.C. § 1641(c). Congress added this provision to TILA in 1980 to "eliminate ambiguity on the question of assignee liability for rescission by stating explicity [sic] that a consumer's exercise of this right is effective against an assignee." S.Rep. No. 96–368, 96th Cong., 2d Sess. 32 33, *reprinted in* 1980 U.S.Code Cong. & Ad. News 236, 268.

Congress could have said that rescission rights are effective against assignees who are not HDC's if it had chosen to do so. Instead, 15 U.S.C. § 1641(c) applies to any assignee. To read the statute not to apply to *any* assignee reinserts the ambiguity Congress attempted to eliminate. Finally, Congress was undoubtedly aware that many consumer credit notes memorializing mortgage transactions in this country are held by persons who could plausibly claim HDC status. To allow an HDC defense to stand against a rescission claim under these circumstances would therefore sanction a situation in which, in the words of the Senate Report on the bill that eventu-ally became 15 U.S.C. § 1641(c), "the right of rescission would provide little or no effective remedy." 1980 U.S.Code Cong. & Ad. News at 268.

In sum, the HDC doctrine is not a defense against TILA rescission. Consequently, the Mehlbergs' assertion of HDC status does not prevent the Stones from cancelling the promissory note at issue.

*Mehlberg,* 728 F.Supp. at 1348 ("[sic]" in original; underscored emphases added).

## CONCLUSION

In light of the foregoing discussion, we conclude that the circuit court erred in granting Ocwen's motion for summary judgment and interlocutory decree of foreclosure. Accordingly, we vacate (1) the Judgment entered by the circuit court on December 7, 1999, and (2) the order entered by the circuit court on December 7, 1999, granting summary judgment and an interlocutory decree of foreclosure in favor of Ocwen. We remand this case for further proceedings, including the allowance of discovery requests by Russell, consistent with this opinion.